J-S32030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF: E.D.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.W., MOTHER | |
| | No. 3380 EDA 2015 |

Appeal from the Decree October 5, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-000341-2014
CP-51-AP-0000718-2014
CP-51-DP-0000367-2014

| | |
|---|---|
| IN THE MATTER OF: J.C.G.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.W., MOTHER | |
| | No. 3382 EDA 2015 |

Appeal from the Decree October 5, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-000341-2014
CP-51-AP-0000717-2014
CP-51-DP-0000366-2014

BEFORE: BOWES, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY MUNDY, J.: **FILED JUNE 09, 2016**

---

[*] Retired Senior Judge assigned to the Superior Court.

Appellant, T.W. (Mother), appeals from the October 5, 2015 decrees involuntarily terminating her parental rights to her daughter, E.D.W., born in December 2012, and her son, J.C.G.W., born in November 2011 (collectively, the Children).[1] Upon careful review, we affirm.[2]

We summarize the factual and procedural history as follows. The Philadelphia Department of Human Services, Children and Youth Division (DHS), received reports in September 2013 and February 2014, alleging that, on August 25, 2013, Mother traveled with the Children from Philadelphia to Maricopa County, Arizona, for the purpose of placing the Children with a private agency for adoption. Trial Court Opinion, 12/17/15, at 1-2. The reports alleged that Mother was hospitalized for two days in Arizona, during which time the Children were placed in the custody of a child welfare agency in Arizona. *Id.* at 2. Thereafter, Mother returned to Pennsylvania. *Id.*

On February 10, 2014, pursuant to an order for protective custody, DHS retrieved the Children from the State of Arizona, and placed them in foster care through the Community Umbrella Agency (CUA). *Id.* at 2. Mother testified during the shelter care hearing on February 12, 2014, that

---

[1] By separate decrees entered on October 5, 2015, the parental rights of J.C.G., the putative father of the Children, were voluntarily relinquished. J.C.G. did not file notices of appeal, and he is not a party to Mother's appeal.

[2] We observe that the Child Advocate joined in the brief by DHS in support of the decrees involuntarily terminating Mother's parental rights.

she took the Children to Arizona "after Mother Goose Adoption Agency informed her that she would receive three thousand dollars for each child placed for adoption." ***Id.*** (citation to record omitted). In addition, Mother acknowledged having suicidal thoughts. ***Id.*** The trial court determined that Mother's mental health posed "a grave threat of harm" to the Children. ***Id.*** As such, it suspended Mother's visits with the Children. ***Id.***

On February 27, 2014, the CUA held the initial Single Case Plan (SCP) meeting and assigned Mother objectives to (1) address and stabilize her mental health and (2) establish and improve her relationship with the Children. ***Id.*** In March 2014, Mother participated in a forensic/parenting capacity evaluation, which revealed that she "struggles in areas of verbal concept formation, reasoning abilities, general information and problem solving." ***Id.*** at 3. On May 20, 2014, the trial court adjudicated the Children dependent.

The trial court subsequently ordered Mother to receive an updated psychiatric evaluation at Assessments & Treatment Alternatives (ATA) and to comply with medication management. ***Id.*** at 3. Following completion of the psychiatric evaluation in July 2014, Mother was diagnosed with mood disorder psychotic features, major depressive disorder, and bipolar disorder. ***Id.*** On August 7, 2014, Mother's SCP objectives were expanded to include addressing anger management issues, obtaining appropriate housing, and verifying employment. ***Id.***

On December 31, 2014, DHS filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In addition, on December 31, 2014, DHS filed petitions for a change of goal to adoption. A hearing was held on October 5, 2015, during which DHS presented the testimony of William Russell, Ph.D., who is employed by the ATA, and who conducted Mother's parenting capacity evaluation. In addition, DHS presented the testimony of CUA caseworkers, Walter Burwell and Leonella DeJesus. Mother testified on her own behalf.

On October 5, 2015, the trial court involuntarily terminated Mother's parental rights. On that same date, the trial court entered orders changing the Children's placement goal to adoption. On November 3, 2015, Mother filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), which this Court consolidated *sua sponte*.[3] **See generally** Pa.R.A.P. 513. On December 17, 2015, the trial court filed a Rule 1925(a) opinion.

_____

[3] We note that Mother filed a single notice of appeal from the termination decrees and the orders changing the placement goal, which was improper. **See** Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed[]"). Moreover, in her concise statement, Mother did not assert any error with respect to the goal change orders.

On appeal, Mother presents the following issues for our review.

> 1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother], under 23 Pa.C.S.A. § 2511 subsections (a)(1), (a)(2), (a)(5), and [ ] (a)(8)?
>
> 2. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Mother's] parental rights best serves the Children's developmental, physical and emotional needs and welfare?

Mother's Brief at 5.

We consider Mother's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that the trial court in this case properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

- 6 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b)  Other  considerations.--**The  court  in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With  respect  to  any  petition  filed  pursuant  to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b). "The grounds for termination of parental rights [under Section 2511(a)(2),] due to parental incapacity that cannot be remedied are not limited to affirmative misconduct … [t]o the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

Further, this Court has stated that a parent is "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* (citation omitted).  "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or

availability of services, may properly be rejected as untimely or disingenuous." *Id.* at 340. (citation omitted).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, with respect to Section 2511(a)(2), Mother argues that DHS failed to present clear and convincing evidence that she is presently incapable of providing proper care for the Children. Mother's Brief at 11. Specifically, Mother argues that the testimony of William Russell, Ph.D., does not support the termination of her parental rights. *Id.* at 11-12. In addition, Mother asserts that she has appropriate employment and housing. *Id.* at 12. We disagree.

Dr. Russell conducted the parenting capacity evaluation of Mother on March 26, 2014. He diagnosed her with Bipolar I and significantly impaired functioning. N.T., 10/5/15, at 18. Dr. Russell testified as follows on direct examination.

> Q. In the course of the interview [during the parenting capacity evaluation] what concerns, if any, did you identify with respect to [Mother's] interactions with her children or with the professionals on the case?
>
> A. There was a history at that point and I observed also that interaction, she had a difficult time interacting appropriately. She would get angry. She would shut down, she would argue, her presentation again was representative of an individual who was going through various moods[.] [I]n her case it appeared to be very manic at different times where she had a difficult time interacting appropriately with her environment.

*Id.* at 13.

In fact, Walter Burwell, the CUA caseworker, testified that he received threats from Mother. *Id.* at 92-93. Leonella DeJesus, a CUA caseworker who assisted Mr. Burwell, testified that in the summer of 2014, Mother visited the CUA office "upset, that she wanted to get her kids back. At that point she said she had hired a detective, and that she knew the name of [Mr. Burwell's] wife and his children." *Id.* at 103. On March 6, 2014, the trial court issued a stay-away order directing Mother to refrain from all contact with Mr. Burwell and from threatening any of the staff in his office. *Id.* at Exhibit 13. Mr. Burwell testified that, by August 2014, Mother "had

become more violent in nature, more threatening" toward him and other officials. *Id.* at 68. Importantly, Mother was directed to address anger management at the ATA, but Mr. Burwell testified that he never received documentation that Mother completed a program. *Id.* at 50-51.

Dr. Russell testified that Mother participated in psychiatric medication management through the ATA. *Id.* at 19. He explained that the ATA stopped prescribing medication to Mother in January or February 2015, upon learning that she was pregnant.[4] *Id.* at 20. He further testified that Mother participated in individual psychiatric therapy, and he implied that this lasted for six months, until she unilaterally ended it in May 2015, prior to the birth of the child. *Id.* at 19-20, 32.

Regarding what progress, if any, Mother made while participating in her individual therapy at the ATA, Dr. Russell testified as follows.

> She was still unstable, she was going through a situation where she had decided to engage in surrogacy[.] ….
>
> And the thinking process that was in place to start that … was significantly impaired at times.
>
> For instance, she went to a psychiatric appointment in January and received medication without telling the psychiatrist that she was pregnant.

---

[4] Dr. Russell testified that Mother participated in a surrogacy program through an agency located in New York. N.T., 10/5/15, at 31. Mother testified on direct examination that she was paid $30,000 to participate in the program. *Id.* at 121.

> Now, luckily she had told the therapist the day before that she was doing the surrogacy thing. So, we were able to immediately get her back in and tell her stop and not take any medication, but that could have had significant ramifications for the pregnancy.

*Id.* at 22-23. Further, he testified, that because Mother was not on medication during the surrogate pregnancy, "she was subject to the thinking distortions of the mania." *Id.* at 33.

Following the child's birth in the summer of 2015, Mother returned to the ATA on August 23, 2015, and on September 10, 2015, for psychiatric medication management sessions. *Id.* at 20. Dr. Russell testified that the ATA advised Mother on both occasions to begin individual therapy again, but she never did. *Id.* As such, Dr. Russell testified that, as of September 10, 2015, one month before the subject proceedings, Mother was not participating in individual therapy. *Id.* at 40. Due to Mother's lack of progress, Dr. Russell's recommendations for Mother have not changed since his report in March 2014, including, but not limited to, individual therapy on a weekly basis. *Id.* at 31, 34-35.

In addition, with respect to Mother's mental health, Ms. DeJesus testified that, in May 2015, Mother sent her a text message "that she wanted to kill herself if she didn't get her kids back." *Id.* at 100. Ms. DeJesus testified, in response, she asked if Mother "would go to the hospital," and Mother told her "no." *Id.* Ms. DeJesus testified that she next

heard from Mother in August 2015, at which time Mother told her she had been hospitalized for mental health. *Id.* at 101.

Regarding her employment, Mother testified to the following on direct examination.

Q. [I]n terms of employment, do you have a job?

A. Yes.

Q. What?

A. I'm a dancer.

Q. And how long have you been a dancer?

A. Since April of this year.

Q. Prior to that what were you doing?

A. Nothing.

*Id.* at 120. However, Mr. Burwell testified her employment was never verified. *Id.* at 58.

With respect to housing, Mr. Burwell testified that when he first obtained the case Mother was living with Maternal grandmother. *Id.* at 53. Mr. Burwell conducted a home inspection and deemed the home inappropriate, *inter alia*, because of an unidentified person in the basement. *Id.* at 54. Mother testified that since March 2015, she has lived in an apartment in Philadelphia. *Id.* at 119. Mr. Burwell however, testified that he requested Mother's counsel to make the appropriate arrangements for

him to visit Mother's apartment, but the arrangements were not made by the time of the hearing. N.T., 10/5/15, at 57.

Significantly, Mr. Burwell testified as follows.

Q. Do you feel the children can safely be returned to [Mother's] care today?

A. No, I do not.

Q. Why not?

A. Just based off the inability to finish anything that she started as far as her getting her psychiatric and mental health needs met, in adequate housing, job security, anger management.

Q. How do you characterize her compliance with the single case plan goals?

A. I would say minimal.

*Id.* at 59-60.

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(a)(2). Indeed, Mother's repeated and continued incapacity and/or refusal to consistently address her mental health needs and to make sufficient progress with her mental health has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the causes of Mother's incapacity or refusal cannot or will not be remedied.

With respect to Section 2511(b), Mother acknowledges that the Children are no longer bonded with her. She asserts that she "did the best

she could to maintain a committed and loving relationship with her Children based on the circumstances." Mother's Brief at 16. We conclude that Mother's argument has no merit.

Our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id*.

Instantly, the trial court found as follows.

> The record established that Children will not suffer any irreparable harm by terminating Mother's parental rights, and it is in the best interest of the Children to terminate Mother's parental rights. Mother and Children do not have a parent/child bond. In fact, the last time that Mother saw her Children was in Arizona on August 29, 2013. The Children never ask for their Mother, they do not know who their Mother is, and do not look for Mother to satisfy their physical[,] developmental and emotional needs. Conversely, the Children recognize[] their foster mother as their main caregiver and call her "Mom." It would be harmful to remove the Children from foster mother['s] care. …. The Children are safe and their needs are satisfied by their foster parent.

Trial Court Opinion, 12/17/15 11-12 (citations to record omitted). Mr. Burwell's testimony supports the court's findings. Indeed, he testified that the Children reside in the same pre-adoptive foster home, and that they are doing well. N.T., 10/5/15, at 42-43, 76. Moreover, Mr. Burwell testified that the Children share a parent-child bond with their foster mother. *Id.* at 61. As such, the testimonial evidence demonstrates that terminating Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Children.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children. Accordingly, we affirm the trial court's October 5, 2015 decrees involuntarily terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/9/2016